**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **CRIMINAL NO. A-12-CR-105 (1) & (2) SS** |
| ) | |
| **Hussein Ali Yassine, a/k/a, "Mike," and** ) | |
| **Hadi Ali Yassine,** ) | |
| ) | |
| **Defendants.** ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States Attorney for the Western District of Texas, by and through the undersigned Assistant United States Attorney, submits the following memorandum1 for the Court's consideration and would show the Court as follows:

1.  On October 12, 2012, defendants Hussein Ali Yassine, also known as "Mike," and Hadi Ali Yassine were found guilty, after a jury trial, as to each of the charges brought against them in the above-captioned case. The jury returned verdicts of guilty against both defendants for conspiracy to commit money laundering as well as substantive money laundering counts. Specifically, defendant Hussein Ali Yassine was found guilty of count one of the indictment, charging him with Conspiracy to Launder Monetary Instruments, in violation of Title 18, United States Code, Sections 1956(h), 1956(a)(1)(B)(i) and 2, as well as counts three, four and five, which charged him with Money Laundering, under Title 18, United States Code, Sections 1956(a)(3)(B) and 2. The jury also returned a verdict of guilty for defendant Hadi Ali Yassine as to count one, charging him with Conspiracy to Launder Monetary Instruments. In addition, the jury found Hadi

Ali Yassine guilty of counts three and four, charging him with Money Laundering, under Title 18, United States Code, Sections 1956(a)(3)(B) and 2.

### I.  The Legal Framework

2. Both defendants have filed numerous objections to the Presentence Investigation Report. The United States has not filed any objections to that report, and submits the instant memorandum in response to the defendants' arguments that the United States Probation Office incorrectly calculated the appropriate sentencing guideline, in that a sixteen (16) point increase, under United States Sentencing Guideline (U.S.S.G.) § 2B1.1, is improperly included in the base level offense calculation. The Defendants' have argued, *inter alia*, that the sixteen point increase does not accurately reflect the amount of money that the defendants are responsible for laundering under the United States Sentencing Guidelines and relevant case-law. As described herein, the defendants' conduct and statements clearly justify the sixteen point increase included by the United States Probation Officer, and the dollar figure included in the PSR should be utilized by the Court when determining the appropriate sentences in this case.

3. In *United States v Tansley*, 986 F.2d 880 (5th Cir. 1993), the Fifth Circuit examined a case in which the defendant placed over one and one half million dollars into various bank accounts in preparation to launder those funds. Before he was able to successfully launder the money, the accounts were frozen, resulting in only a small fraction of the funds being siphoned off. In determining the proper offense level, the district court used the larger figure, representing the entire amount that was processed as part of the scheme. In upholding that calculation, the Fifth Circuit held that "The intention of laundering the entire amount is enough for sentencing purposes. Funds

---

[1] The Government received Hadi Ali Yassine's Sentencing Memorandum on January 22, 2013 after 9:00 PM, and

under negotiation in a laundering transaction are properly considered in the calculation of a sentence." *Id.* at 884 (internal citations omitted).

4. In *United States v. Richardson*, 925 F.2d 112, (5th Cir. 1991), *cert. denied*, 501 U.S. 1237 (1991), the Fifth Circuit examined a similar issue in the context of a money laundering sting. In fact, the court analyzed three issues raised by the Defendants in this case. First, the court reviewed a transaction in which the defendant claimed that he did not know that the funds were derived from illegal activity. The court found "… even if Richardson did not know at the time that the initial transaction was illegal, his knowledge if its illegality at the time he agreed to engage in the second money laundering transaction rendered the initial transaction relevant conduct under the Guidelines." *Id*. at 116. In making this determination the court referenced U.S.S.G. § 1B1.3 and stated that "the Guidelines strongly suggest that a defendant can be held accountable for acts of a conspiracy prior to his joining, 'if those acts were … reasonably foreseeable in connection with … the criminal activity he agreed to jointly undertake.'" *Id*. This rationale clearly applies to the September 19, 2008 money laundering transaction, as to Hussein Ali Yassine, as well as the June 24, 2009 money laundering transaction as to Hadi Ali Yassine.

5. Second, the *Richardson* court examined Richardson's contention that he was trying to "rip off" the undercover agents for an additional $225,000 that those agents produced during the sting operation, and thus that there was inadequate evidence to include those funds in the offense level calculation. The court rejected this argument and stated, "His extensive discussions with the government agents regarding his money laundering expertise provides an adequate basis for the district court's conclusion that he did intend to launder the money. *Id*. In arriving at its decision, the court also looked to the U.S.S.G's application in controlled substance cases. The court stated:

---

Hussein Ali Yassine's Sentencing Memorandum on January 23, 2013 after 5:00PM.

>We also note the analogous situation involving the distribution of controlled substances, in which the question arises whether the weight under negotiation in an uncompleted distribution should be used to calculate the applicable amount for sentencing purposes. The Guidelines clearly articulate that it should, unless the court finds that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount. U.S.S.G. § 2D1.4, comment (n. 1). We believe that the same policy considerations ***dictate that the amount of funds under negotiation in a laundering transaction may be used to calculate the defendant's sentence***.

*Id*. at n. 12 (*emphasis added*).

6.    In the instant case, Hussein Ali Yassine engaged in extensive discussions with the cooperating witness about larger and additional money laundering transactions. On more than one occasion, he suggested different ways in which larger quantities of cash could be laundered using the businesses he owned. Thus, as in *Richardson*, there exists an adequate and appropriate basis for this Court to include the larger amount of cash that he intended to launder ($1,000,000) in the offense level calculation. Moreover, it is clear that Hussein Ali Yassine was ***capable*** of laundering additional funds, as he explained that his businesses brought in twelve million dollars a year. *See* Government Exhibit 24, pg. 241.

7.    Finally, the *Richardson* court examined the defendant's argument that the government had engaged in sentencing entrapment, thereby violating the defendant's due process rights under the United States' Constitution. In rejecting that argument, the court stated, "… it would be difficult to conclude that the government unfairly manipulated the amount of money involved in the "sting" operation, when the evidence shows that Richardson repeatedly asked for larger sums to launder and suggested additional laundering scenarios." *United States v. Richardson*, 925 F.2d at 118. Once again, these fact mirror the instant case where, as described below, Hussein Ali Yassine, both requested additional funds and also suggested additional money laundering techniques. Nothing in Defendant Hussein Ali Yassine's Sentencing Memorandum vitiates the fact that Hussein Ali Yassine

actively sought additional funds from the CHS and suggested ways in which the money laundering could be accomplished without law enforcement detection and in larger quantities.

8. In *United States v. Fuller*, 974 F.2d 1474, (5th Cir. 1993) the Fifth Circuit again examined a sentencing enhancement based on negotiations in a money laundering conspiracy case. In that case, the defendant discussed the ease with which he could launder $1,000,000 per month. The 5th Circuit upheld the district court's determination that the amount involved in the offense was over two million dollars and stated that the district court was well within the bounds of reason in determining that the amount of money that the defendants were "*reasonably capable*" of laundering was the appropriate amount. The court went on to state that "Fuller had the perfect cover, the Brazil land sale for $25,000,000. That sum would provide the shade of validity to launder the drug money from the clients of the government agent." This is exactly the situation presented in the instant case where the twelve million dollars per year that Hussein Ali Yassine stated his nightclubs produced would provide the same shade of validity for laundering the cooperating witness' illegal proceeds. *See also*, *United States v. Tansley*, 986 F.2d at 884, ("The court may also use the broader amount that defendants could have been '*reasonably capable*' of laundering." (citing, *United States v. Fuller*, 974 F.2d at 1484.))(*emphasis added*).

## II. Analysis

9. Viewed under the legal standards set out above, the Defendants' statements and actions throughout the money laundering conspiracy clearly justify the addition of the one million dollar figure utilized in the Presentence Investigation Report. The following summaries of communications demonstrate that Hussein Ali Yassine was capable of and in fact intended to launder *at least* an additional one million dollars in narcotics proceeds for the government's cooperating

witness (CHS).  The entirety of Government Exhibit Number 24 is attached hereto as Exhibit A.

10. In a May 28, 2009, telephone call, (Government Exhibit 24, pgs. 180-81) when asked what the maximum amount of cash Hussein Ali Yassine could launder, Hussein Ali Yassine told the CHS that he would take, "As you want.  100,000, 200,000, 300,000.  As you want."   Later in that same discussion, Hussein Ali Yasine told the CHS that he would take "any amount you want." *See* Government Exhibit 24, pg. 183.

11. On June 24, 2009, Hussein Ali Yassine spoke to the CHS about laundering additional funds.  After discussing the time frame in which the checks that he already agreed to provide would clear, Hussein Ali Yassine and the CHS discussed laundering another $100,000.  Hussein Ali Yassine told the CHS to, "Bring me another."  Hussein Ali Yassine then asked if the CHS' bosses could do 200,000 at the same time.  When the CHS explained that they could, Hussein Ali Yassine told the CHS, "You should have brought me another $100K."  When the CHS explained that he was concerned about his taxes, Hussein Ali Yassine explained that he had a solution – to again disguise the money laundering as a loan.  Government Exhibit 24, pgs. 223-26. This was not the first or the last time that Hussein Ali Yassine came up with methods to disguise the illegal money laundering transactions.

12. Later, on that same day, in a recorded telephone call, Hussein Ali Yassine and the CHS discussed the timing of laundering an additional sum of cash.  When the CHS told Hussein Ali Yassine that he could send "200," Hussein Ali Yassine asked, "When?" - and stated that they would have to do it by Saturday.  The two went on to discuss the fee that Hussein Ali Yassine would receive for laundering $200,000.   Government Exhibit 24, pgs. 237-38. This recorded communication demonstrates that Hussein Ali Yassine both intended to, and was capable of, laundering additional, larger sums of money – *at least* up to one million dollars.

13.     After talking to a representative from BMW, Hussein Ali Yassine again spoke to the CHS on the telephone. Government Exhibit 24, pgs. 240-41. In this important conversation, Hussein Ali Yassine made it clear that he intended to launder the additional cash, telling the CHS, "Yeah, good. Call me – tell me for sure if you're gonna come Saturday or not." When the CHS asked how the CHS was going to handle his taxes, Hussein Ali Yassine told the CHS "I know – I know. I already know, man. I already got that covered." The CHS expressed his concern that when they were done [with the money laundering transactions], the laundered cash would amount to almost one million dollars. At this juncture, Hussein Ali Yassine explained, "**Hey, it doesn't matter. It's fine. Cous', I bring, I bring, I bring in twelve million a year. Do you think that is gonna cause a problem?**" He repeated the twelve million dollar figure later in the same conversation. This communication provides another clear example of Hussein Ali Yassine's capability and intent to launder up to at least one million dollars. As in the *Fuller* case cited above, the "legitimate" income produced by Yassine Enterprises provided a perfect cover for laundering large sums of illegal narcotics proceeds. As in *Fuller*, the Court should include the amount of money that Hussein Ali Yassine was capable of laundering, and which he expressed a clear intent to launder, when determining the appropriate offense level.

14.     It should be noted that the evidence at trial demonstrated that there was no reservation and no hesitancy by Hussein Ali Yassine as he explained his money laundering capabilities. However, he did express serious concerns about being caught. When the CHS assured Hussein Ali Yassine that he would call him for sure [about the next transaction], Hussein Ali Yassine stated, "But, uh, I need to know – I need to know if the guy, he gets-gets caught." Government Exhibit 24, pg. 241. Importantly, the evidence at trial showed that it was the FBI, not Hussein Ali Yassine or the other defendants, which discontinued the money laundering transactions. Thus, the evidence at trial

demonstrated that but for the refusal of the FBI to continue bringing large sums of cash to Hussein Ali Yassine and Yassine Enterprises, the money laundering transactions would have continued.

15.     In another recorded telephone call, on July 29, 2009, (Government Exhibit 24, pgs. 253-56) the CHS asked Hussein Ali Yassine how much more money he could launder next year. After discussing the checks that still remained to be cashed from the last money laundering transaction, the CHS asked Hussein Ali Yassine, "Now do you want me to bring you some more?" Hussein Ali Yassine responded, "Send it if you still have some.  Send it!"  The CHS asked how much more Hussein Ali Yassine could launder and Hussein Ali Yassine stated, "…we should just do like uh 100,000 at the time. Right now, if you have one hundred thousand, send it."  When the CHS again asked how much Hussein Ali Yassine could do in one year, Hussein Ali Yassine stated, "We can – we can do 1,000,000 in a year … Well, 100,000 per month." *See* Government Exhibit 24, pg 255.  Once again, this statement clearly shows that Hussein Ali Yassine intended, and was capable of, laundering an additional $1,000,000, in $100,000 increments, through Yassine Enterprises. Indeed, even as the checks were clearing from the prior money laundering transaction, Hussein Ali Yassine was interested, in fact eager, to launder additional drug money.

16.     In the December 7, 2010, meeting at Hussein Ali Yassine's penthouse apartment at the Hilton Hotel in Austin, Hussein Ali Yassine once again demonstrated his intent to launder additional illegal narcotics proceeds. (Government Exhibit 24, pgs. 299-300.). The evidence at trial established that it was Hussein Ali Yassine who requested additional funds from the CHS on this occasion – giving up his usual fee for laundering the money, and stating, "I'm the one that came to you."  Government Exhibit 24, pg. 315.  When the CHS asked, "How much do you want?  Didn't you say you wanted 200?" - Hussein Ali Yassine said, "Yeah."  In the same conversation, Hussein Ali Yassine asked the CHS "How much are they going to give you?"  The CHS responded that

Hussein Ali Yassine asked for two hundred [thousand], and the CHS also told Hussein Ali Yassine that "They have more if you want it. There's more than that." Hussein Ali Yassine then stated, "The maximum they want to give you." Government Exhibit 24, pg. 304. Again, this establishes that Hussein Ali Yassine was willing and able to launder additional illegal proceeds, as he inquired about the upper limits on the CHS' bosses' drug money. Still later, in the same meeting, (Government Exhibit 24, pg. 310), Hussein Ali Yassine stated that he could launder "From 100 to 500, whatever they want." It is in this same penthouse meeting on December 7, 2010, wherein Hussein Ali Yassine and the CHS spent a significant period of time discussing various ways in which they could use Yassine Enterprises' nightclubs and fictitious corporations to launder large sums of cash, in addition to other money laundering schemes.

17.     Thus, under the legal standard set out by the Fifth Circuit, there is ample evidence in the record that supports the inclusion of an additional one million dollars in calculating the proper offense level in this case with respect to Hussein Ali Yassine; and if that is the appropriate figure, the Court should apply it to Hadi Ali Yassine as well.

18.     As described above, Hadi Ali Yassine is responsible for the same amount of laundered, illegal proceeds as his brother. The jury found him guilty of conspiring with Hussein Ali Yassine to launder the money that the CHS brought to Yassine Enterprises – count one of the indictment – the only conspiracy charged. The evidence at trial demonstrated that he derived his livelihood from Yassine Enterprises; created his own company, Famous Vodka, from funds provided by Yassine Enterprises, and worked inside of the Yassine Enterprises headquarters. In addition, he was present for many of the incriminating conversations between Hussein Ali Yassine and the CHS. The evidence at trial further showed that Hadi Yassine had full knowledge of what the CHS and Hussein Ali Yassine were doing, and that he profited from it, and even warned the CHS not to

"…put *us* in problems..." Government Exhibit 24, pg. 67 (*emphasis added*). Finally, the evidence at trial clearly established that Hadi Ali Yassine knew that the CHS was a drug trafficker. As a co-conspirator and a member of the criminal venture, and also under U.S.S.G. § 1B1.3, he is at least responsible for the amount of laundered funds that were reasonably foreseeable during the course of the conspiracy. As described herein, as demonstrated at trial, and as calculated by the United States Probation Officer, that amount should include an additional $1,000,000.

Dated: January 24, 2013                                      Respectfully submitted,

                                                             RICHARD L. DURBIN, JR.
                                                             Attorney for the United States
                                                             Acting Under the Authority
                                                             Conferred by 28 U.S.C. § 515

                                                             /S/ GREGG N. SOFER
                                                             Gregg N. Sofer
                                                             Assistant United States Attorney
                                                             816 Congress Avenue, Suite 1000
                                                             Austin, Texas 78701
                                                             Tel: 512/916-5858
                                                             Fax: 512/916-5854
                                                             Bar No. NY106209

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 24th day of January, 2013, a true and correct copy of the foregoing instrument was filed with the Clerk of the Court. Notification of such filing will be emailed to:

David L. Botsford
Botsford & Roark
1307 West Avenue
Austin, TX 78701
(512) 479-8030


E.G. Morris
608 West 12th Street, Suite B
Austin, TX 78701
(512) 478-0758

                                                /S/ GREGG N. SOFER
                                                Gregg N. Sofer
                                                Assistant United States Attorney